NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1114

MEDEGEN MMS, INC.
(formerly known as Porex Medical Products, Inc.),

Plaintiff-Appellant,

v.

ICU MEDICAL, INC.,

Defendant-Appellee.

Ted G. Dane, Munger, Tolles & Olson LLP, of Los Angeles, California, argued for plaintiff-appellant.

James Pooley, Morrison & Foerster, LLP, of Palo Alto, California, argued for defendant-appellee. With him on the brief were Kimberly N. Van Voorhis and Diana Luo.

Appealed from: United States District Court for the Central District of California

Senior Judge Mariana R. Pfaelzer

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1114

MEDEGEN MMS, INC.
(formerly known as Porex Medical Products, Inc.),

Plaintiff-Appellant,

v.

ICU MEDICAL, INC.,

Defendant-Appellee.

Appeal from the United States District Court for the Central District of California in case no. 06-CV-619, Senior Judge Mariana R. Pfaelzer.

———————————————

DECIDED: November 20, 2008

———————————————

Before RADER and DYK, Circuit Judges, and WALKER, Chief District Judge.[*]

Opinion for the court filed by Circuit Judge DYK, in which Circuit Judge RADER joins. Dissenting opinion filed by Chief District Judge WALKER.

DYK, Circuit Judge.

Plaintiff-Appellant Medegen MMS, Inc. ("Medegen"), appeals from a final order of the district court granting judgment of noninfringement to Defendant-Appellee ICU Medical, Inc. ("ICU"), with respect to claims 27-28, 31, 39, 41, 42, 47, 53-55, 59, 62, and 63 of U.S. Patent No. 5,730,418 ("the '418 patent"). See Medegen MMS, Inc. v. ICU

———————————————

[*] Honorable Vaughn R. Walker, Chief Judge, United States District Court for the Northern District of California, sitting by designation.

<u>Medical, Inc.</u>, No. 06-619 (C.D. Cal. Sept. 14, 2007). Because the district court erred in its construction of the claim term "plug," we vacate and remand.

BACKGROUND

Medegen owns the '418 patent, entitled "Minimum Fluid Displacement Medical Connector." The patented invention is directed to a needle-free valve for intravenous (I.V.) therapy used to administer fluids to a medical patient. In particular, the patented device connects a syringe to a catheter, for adding or removing fluids from a patient's circulatory system.

A common problem associated with such connectors in the prior art is a phenomenon known as retrograde flow. Retrograde flow is the reverse flow of fluid out of the patient's body and back into the catheter tubing, the connector, and the syringe, caused by the negative pressure suction that occurs as the syringe is withdrawn from the connector. Retrograde flow is undesirable because the backflow of fluid often contains blood, which causes clotting, and can impede fluid flow through the catheter. Blocked catheter tubing requires either flushing of the tube or complete replacement of the catheter.

The patented invention significantly reduces unwanted retrograde flow by compensating for the negative pressure introduced into the connector by the removal of the syringe with a positive pressure introduced by a plug. That is, as the syringe is removed from the connector, a portion of the plug slides into a valve internal chamber of the connector, thereby reducing the volume of the valve internal chamber, which in turn eliminates the pressure suction of fluid flow out of the patient's body.

The patent discloses several embodiments having different types of plugs, which can be characterized as either a sliding-type plug, or a collapsible-type plug. The collapsible-type plug collapses like an accordion as the syringe is inserted into an inlet valve, thereby reducing the volume of the internal chamber. See, e.g., '418 patent Fig.3. The sliding-type plug, exemplified in Figures 1 and 2, includes an elastomeric proximal portion that buckles and rotates when the syringe is inserted into the inlet valve, and a distal portion that slides in and out of an air chamber, which is located at the far end of the connector. The buckling and rotation of the proximal portion of the plug creates an opening for fluid flow between an inlet valve and the valve internal chamber. The axial movement of the distal portion creates the change in volume in the internal chamber, thereby achieving a reduction of the unwanted retrograde flow.

In May 2001, Medegen brought this action against ICU, alleging infringement of the '418 patent by ICU's CLC2000 Connector. In response, ICU asserted several affirmative defenses, including invalidity of the '418 patent. Because ICU's invalidity defense relied on several prior art references that were not considered by the Patent Office, Medegen filed a petition seeking reexamination of the '418 patent. The Patent Office granted the petition, and Medegen voluntarily dismissed its claims against ICU pending the outcome of the reexamination proceeding. On April 11, 2006, the Patent Office issued a Reexamination Certificate for the '418 patent, allowing claim 28 as originally drafted, claims 1-3, 5, 6, 16-27, and 31-32 as amended, and new claims 33-77. Medegen re-filed its infringement action against ICU, asserting infringement of thirteen claims of the '418 patent, including: claims 27-28, 31, 39, 41, 42, 47, 53-55, 59, 62, and 63.

Of the asserted claims, several include a "plug" limitation, several include a "biased-member" limitation, and several include a "displacing means" limitation. Claim 27 is representative of the asserted "plug" claims:

A self-flushing connector, comprising:

> a valve internal chamber;

> a valve inlet port adapted for receiving an actuator, the actuator having a lumen for introducing fluid through the valve inlet port and into the valve internal chamber;

> a valve outlet port adapted for outputting fluid from the valve internal chamber, the valve outlet port being in fluid communication with the valve internal chamber at all times and being adapted for allowing fluid to freely flow into and out of the valve internal chamber through the valve outlet port at all times;

> an air chamber; and

> a plug adapted for being moved into a portion of the air chamber when the actuator is moved into the valve internal chamber and for being moved out of a portion of the air chamber when the actuator is removed from the valve internal chamber, movement of the actuator into the valve internal chamber resulting in a relatively small movement of fluid through the valve outlet port and into the valve internal chamber, and movement of the actuator out of the valve internal chamber resulting in a relatively small movement of fluid through the valve outlet port and out of the valve internal chamber.

'418 patent col.4 l.52-col.5 l.8 (emphasis added). Asserted claims 31 and 47 have a "biased member" limitation, which the parties agree is simply a "plug" subjected to a biasing force.

Claim 28 is representative of the asserted "displacing means" claims:

A self-flushing connector, comprising:

> a valve inlet port adapted for receiving an actuator in an inward direction into the valve inlet port, the actuator having a lumen for introducing fluid through the valve inlet port in the inward direction;

a valve outlet port adapted for transferring fluid in one of a first direction out of the self-flushing connector and a second direction into the self-flushing connector; and

displacing means adapted for providing displacements of fluid within the self-flushing connector, the displacing means effecting a relatively small movement of fluid through the valve outlet port in the second direction in response to movement of the actuator in the inward direction, and the displacing means effecting a relatively small movement of fluid through the valve outlet port in the first direction in response to movement of the actuator in an outward direction opposite to the inward direction.

'418 patent col.12, ll.8-26 (emphasis added).

After a Markman hearing, the district court issued a claim construction order, construing several of the disputed claim terms, including "plug," biased member," and "displacing means." Based on its reading of the specification and the prosecution history, the district court construed the term "plug" as "an elastomeric part that either pivots about a reduced diameter portion or buckles, to establish a fluid flow path." J.A. at 19. The court construed "biased member" as "a biased plug, or a plug subject to a biasing force, such as a spring." Id. at 19-20. And, as modified by its summary judgment order, the court found that the function performed by the displacing means was "to provide displacements of fluid within the connector," J.A. at 11, 42-43, and that the corresponding structure included "the whole 'plug,' the 'air chamber' and the 'valve internal chamber.'" J.A. at 47.

Following the court's claim construction order, ICU filed a motion for summary judgment of noninfringement of its CLC2000 Connector, which contains a rigid plug. Medegen, conceding that it could not establish infringement based on the district court's construction of "plug" and "biased member," agreed to a stipulated judgment of noninfringement for the "plug" claims and the "biased member" claims. The district

court granted ICU's motion for summary judgment of noninfringement of the "displacing means" claims based on its conclusion that ICU's CLC2000 did not include a "displacing means." The district court held that the CLC2000 did not literally infringe the "displacing means" claims because the poppet found in the accused product was rigid, not elastomeric. It also found that the poppet was not a structural equivalent of the corresponding structure of the "displacing means." The district court entered a judgment of noninfringement as to all of the asserted claims based on Medegen's concessions and the court's summary judgment decision. Medegen timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).[1]

## DISCUSSION

The primary issue on appeal is the construction of the term "plug." The parties agree that the term "plug" does not have a well-accepted meaning in the art of medical connectors for intravenous fluid flow. Claim construction is a question of law which we review de novo. Sinorgchem Co., Shandong v. Int'l Trade Comm'n, 511 F.3d 1132, 1136 (Fed. Cir. 2007); Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

---

[1] This case was made significantly more difficult by both parties' inaccurate assertions in their briefs on appeal that, "Medegen withdrew [the plug] claims without prejudice to its rights to reinstate them in the event the court's claim construction order was reversed on appeal." Appellant's Br. at 4-5; see also Appellee's Br. at 2 n.2 ("Medegen dismissed those claims before judgment of non-infringement was entered."). At oral argument, both parties admitted that these descriptions were inaccurate. Instead, Medegen stipulated to noninfringement of the "plug" claims based on the district court's construction of that term. The district court entered an adverse judgment against Medegen on those claims.

We note that counsel are responsible for ensuring that the briefs contain accurate information. That responsibility was not fulfilled in this case.

The district court construed "plug" as "an elastomeric part that either pivots about a reduced diameter portion or buckles, to establish a fluid flow path." J.A. at 19. In doing so, the district court relied heavily on the finding that "the preferred embodiment[s] of the invention, as discussed throughout the specification and claims, all consistently discuss a plug" with the elastomeric feature, and that the specification "nowhere describes a non-elastomeric or rigid plug." Id. at 14. The district court also stated that Medegen "needed to indicate in the '418 Patent that a skilled artisan could use alternative plugs and describe how such plugs would perform the functions of controlling fluid flow and achieving minimum fluid displacement in the context of its invention." Id. at 19.

Medegen argues that the district court improperly limited the scope of the claims to the preferred embodiments, and that, instead, "plug" should be given its ordinary meaning: either the district court did not need to construe it at all or should construe it to mean "a moveable member between an open and closed position." Id. at 13.

It is, of course, "a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Here, the term "plug" is claimed broadly. The term "plug" is not expressly limited by the language of the claims—that is, the elastomeric limitation is not found within the claim itself. Also, there is no contention that the ordinary meaning of the term "plug" does not include a rigid plug or that it has a special meaning in the medical field that requires

elastomericity, or that there was any clear disclaimer of non-elastomeric plugs in the specification.

Nonetheless, ICU contends that the specification is "the single best guide to the meaning of a disputed term," Phillips, 415 F.3d at 1315, and that one of ordinary skill in the art would read the specification as limited to elastomeric plugs, and that the district court correctly construed "plug" based on that limited disclosure. We disagree. The patent here makes clear that the elastomeric feature of the plug is merely an example of how to create a fluid flow connection between the inlet valve and the internal fluid chamber. The use of an elastomeric plug to establish that fluid flow connection is not central to the invention itself, which is directed to reducing retrograde flow. Indeed, the summary of the invention describes the plug entirely in general terms:

> The minimum fluid displacement self-flushing connector further includes an air chamber and a plug adapted for being moved into a portion of the air chamber when the actuator is moved into the valve internal chamber. Movement of the plug into the air chamber results in a minimum displacement of fluid through the valve outlet port when the actuator is moved into the valve internal chamber.
> . . . .
>
> The plug has a generally cylindrical shape which is also generally centered about the inlet port axis, and the plug is adapted for being moved from an inlet port closed position to an inlet port open position.

'418 patent col.3 l.61-col.4 l.10. Nothing in this general description suggests that the plug must be elastomeric.

ICU instead relies on the Detailed Description, noting that "the '418 patent refers to the 'elastomeric' or 'rubber' quality of this plug twenty-one times in the detailed description." Appellee's Br. at 14 (citing examples). These examples, however, are each directed to preferred embodiments. For example, the specification provides that

"[w]hen the actuator 90 is removed from the valve inlet port 21, the spring 74 biases the elastomeric valve plug 14 back through the valve throat 23 and into the valve inlet 21." '418 patent col.6 ll.25-28 (emphasis added). Several paragraphs later, the specification refers to a "first alternative embodiment of the present invention," '418 patent col.7 l.13, making clear that the prior discussion referred to a separate preferred embodiment. Clearly, those portions of the specification are not referring to the invention as a whole, but rather to one aspect of a preferred embodiment. This is not a situation where "the specification [reveals] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." Phillips, 415 F.3d at 1316; see also Sinorgchem, 511 F.3d at 1136.

ICU essentially relies on a single embodiment theory—that is, that the construction should "reflect[] the single, preferred embodiment," which in this case, includes the elastomeric feature of the plug. Appellee's Br. at 12. But the single embodiment argument was specifically rejected by Phillips. There, we stated:

> [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments. In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

Phillips, 415 F.3d at 1323 (emphasis added, internal citations omitted). Indeed, in Phillips, we went on to reject a restrictive construction of the disputed claim term in light of the specification, and the effort to import limitations not found in the claims. Id. at 1328.

ICU also asserts that Medegen disavowed rigid plugs in the prosecution history. It points to a statement made during reexamination that "the plug proximal portion is pivotable about the reduced diameter portion. . . . This feature is shown in all the illustrated embodiments." J.A. at 3088. But, as Medegen points out, this statement was made only to provide support for a dependent claim (claim 35) that particularly recited that pivotable feature of the plug: "the biased member proximal portion comprising a reduced diameter portion, the biased member proximal portion being pivotable about the reduced diameter portion." J.A. at 114 It was not a statement made to distinguish the invention over the prior art or to limit the scope of claims that did not include such a limitation. The other statement that ICU relies on distinguished the collapsible-type plugs from the sliding-type plugs. Medegen stated in a reply to an office action that "a plug portion can be both non-collapsible and bendable at the same time." J.A. at 3085. We find this statement unremarkable, as it is simply a description of one of the preferred embodiments (i.e. the embodiment of Figures 1-2). In short, nothing in the prosecution history supports ICU's claim that Medegen disavowed rigid plugs.

Under these circumstances, it is clear that the construction of "plug" need not be limited to the preferred embodiments. "Plug" should instead be given its ordinary meaning: "a member moveable between an open and closed position." The district construed "biased member" to mean "a biased plug, or a plug subject to a biasing force, such as a spring." Id. at 19-20. That construction must now be read to incorporate the correct definition of plug.

Medegen also argues that the district court erred in construing "displacing means" in claims 28 and 42. The term "displacing means," recited in claims 28 and 42,

is a means-plus-function claim term under 35 U.S.C. § 112, ¶ 6.[2]  The parties agreed below that the function of the "displacing means" is "to provide displacements of fluid within the self-flushing connector."  J.A. at 10.  In connection with its order granting summary judgment, the district court found that the corresponding structure of the term "displacing means" includes "the whole 'plug,' the 'air chamber' and the 'valve internal chamber.'"  J.A. at 47.  On appeal, the parties now agree that a plug is included in the structure that performs the described displacement function.  Apart from this agreement, the parties appear to agree on little else with respect to the issue of corresponding structure.

ICU contends that the plug alone is the corresponding structure, while Medegen concludes that the corresponding structure includes the plug, an air chamber, and a valve internal chamber.  It is unclear whether this broader interpretation makes any difference for present purposes.  ICU appears to contend that, because a rigid structure is not within the district court's construction of the claim term "plug," a rigid plug is not corresponding structure for § 112, ¶ 6 purposes, and that accordingly, the accused device does not infringe claims 28 and 42 because it uses a rigid plug.  We have rejected the district court's claim construction of the term "plug" as limited to elastomeric plugs.  However, the question remains whether, for purposes of the means-plus-

---

[2]    35 U.S.C. § 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim <u>shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof</u>.

(emphasis added).

function claims, the corresponding structure is limited to the elastomeric plug described in the preferred embodiments, or whether the structure also encompasses plugs generally, including rigid plugs (which we have found are included within the scope of the "plug" claims), as described in broad terms in the summary of the invention.

Relying on a number of our decisions, see, e.g., Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 909 (Fed. Cir. 2005), Medegen argues that the corresponding structure of the "displacing means" is not limited to the elastomeric plug depicted in the figures. ICU, relying on Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 951-53 (Fed. Cir. 2007), asserts that the district court properly focused on the correct corresponding structure, and that Medegen's reliance on the summary of the invention is misplaced.

In view of the limited and somewhat confusing briefing on this issue, we think that the best course is to leave this issue open on the remand so that the district court can arrive at a proper construction of the corresponding structure in claims 28 and 42, in light of our determination that the term "plug" in claim 27 (and its dependent claims) is not limited to elastomeric plugs. We note that, given our construction of the term "plug" in claim 27 (and its dependent claims), the construction of claims 28 and 42 may prove to be unimportant in the overall determination of infringement.

CONCLUSION

For the foregoing reasons, we VACATE and REMAND.

VACATED AND REMANDED

No costs.

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1114

MEDEGEN MMS, INC
(formerly known as Porex Medical Products, Inc),

Plaintiff-Appellant,

v

ICU MEDICAL, INC,

Defendant-Appellee.

Appeal from the United States District Court for the Central District of California in case no. 06-CV-619, Senior Judge Mariana R Pfaelzer.

_____

DECIDED:    November 20, 2008

_____

Before RADER and DYK, <u>Circuit Judges</u>, and WALKER, <u>Chief District Judge</u>.[*]

WALKER, <u>Chief District Judge</u>, dissenting.

This case presents a conundrum often faced by district courts when construing claims: Whether and how to consider claim-limiting language found only in the specification.  Our court has not been silent on this issue:

> We have had many occasions to cite one or both of the twin axioms regarding the role of the specification in claim construction: On the one hand, claims "must be read in view of the specification, of which they are a part."  <u>Markman v Westview Instruments, Inc</u>, 52 F3d 967, 979 (Fed Cir 1995), aff'd, 517 US 370 (1996).  On the other hand, it is improper to read a limitation from the specification into the claims.  <u>Arlington Indus, Inc v</u>

---

[*]       Honorable Vaughn R Walker, Chief Judge, United States District Court for the Northern District of California, sitting by designation.

> Bridgeport Fittings, Inc, 345 F3d 1318, 1327 (Fed Cir 2003); Gart v Logitech, Inc, 254 F3d 1334, 1343 (Fed Cir 2001). Although parties frequently cite one or the other of these axioms to us as if the axiom were sufficient, standing alone, to resolve the claim construction issues we are called upon to decide, the axioms themselves seldom provide an answer, but instead merely frame the question to be resolved.

Liebel-Flarsheim Co v Medrad, Inc, 358 F3d 898, 904 (Fed Cir 2004).

I fear the majority, armed with too rigid an interpretation of the court's recent decision in Phillips v AWH Corp, 415 F3d 1303 (Fed Cir 2005) (en banc), has not heeded its own admonition and now overturns the district court's construction of the term "plug" based on the latter axiom standing alone.

It is good policy, of course, to require patent writers to place all claim limitations in the claims of the patent. Section 112 of the Patent Act gives clear marching orders in this regard: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 USC § 112 ¶2. The claims define the inventor's right to exclude, and, just as a patent holder should not be allowed to broaden an inventor's claims based on the written description, construing courts must take care not to narrow claims unduly.

But patents must be read as well as written. Judges, parties and the public must understand claim terms by giving them their "ordinary and customary meaning." Phillips, 415 F3d at 1312 (internal quotation omitted). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention * * *." Id at 1313. This person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.

The majority concludes that "'[p]lug' should * * * be given its ordinary meaning: 'a member movable between an open and closed position,'" without ever explaining why it considers this to be the "ordinary" meaning. Perhaps the majority considers this to be the ordinary meaning because it is similar to the broad dictionary definitions offered by Medegen: "a piece of wood, metal, or other material used or serving to fill a hole" or "a stopper, stopple or bung." But construing claim terms based on dictionary definitions or even on the court's existing understanding of commonly used words — the "a plug is a plug" line of reasoning — risks polluting the claim construction analysis with the biases the Phillips court warned of when observing that "extrinsic evidence in general, [is] less reliable than the patent and its prosecution history in determining how to read claim terms * * *." Phillips, 415 F3d at 1318-19.

The very able district court, on the other hand, looked first to the patent in its effort to construe "plug" as a person of ordinary skill in the art of medical connectors would after reading the entire '418 patent. In its claim construction order, the district court observed that the specification and the figures of the '418 patent repeatedly show the plug to have the elastomeric, pivoting and buckling limitations the district court included in its construction of 'plug.' The district court was cognizant of our warnings against confining claims to a preferred embodiment, but, after examining the entire patent, determined that the claimed invention would not work without the plug having the elastomeric and buckling or pivoting limitations. The specification's consistent descriptions of the plug as elastomeric and pivoting or buckling disclosed an essential element of the invention — those characteristics prevent the syringe from forming a seal with the plug and allow the opening of the fluid path necessary for the invention to work.

See, e g, '418 patent fig 2. Having determined that the specification suggests a narrower definition of "plug" than that advocated by Medegen, the court then turned to extrinsic evidence: it asked Medegen's counsel how a rigid plug would work in Medegen's device, and did not receive a satisfactory response. The expert report submitted by ICU also supports the court's finding that one skilled in the art of medical connectors having read the '418 patent at the time of invention would have understood the "plug" to be elastomeric and able to pivot and buckle.

The majority relies heavily on Phillips's rejection of the "contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." Phillips, 415 F3d at 1323. But the district court here did not determine that the patent must be construed as limited to a single embodiment simply because just one embodiment was described. Rather, it determined that the invention described in the '418 patent would not work without the limitations to "plug" described in the specification. This was not the case in Phillips, where our court noted that some of the embodiments in the patent at issue did not include the limitations improperly incorporated into the claim construction by the district court. Id at 1325-26 ("Importantly, Figures 4 and 6 do not show the baffles as part of an 'intermediate interlocking, but not solid, internal barrier.'"). The claim limitations at issue in Phillips were not essential to the invention; here, it appears, they are.

"[I]n a given case, the scope of the right to exclude may be limited by a narrow disclosure." Gentry Gallery v Berkline Corp, 134 F3d 1473, 1479 (Fed Cir 1998). It appears that this may be such a case. As a jurist more accustomed to working on the front lines of patent litigation than reviewing decisions from above, it is my experience

that claim construction — determining how one of ordinary skill in the art would understand the patent at the time of invention — often requires making fact-like determinations not well suited to appellate review.

My concern is that the majority has exaggerated the utility of the axiom that a limitation from the specification should not limit the claims. This results in sending the case back to the district court almost two-and-a-half years after it commenced, and almost a year and a half after the <u>Markman</u> hearing, for the preliminary step of construing the claim terms. While guidance from this court is essential to creating uniformity and predictability in patent litigation, the district court here did not depart from our basic instructions. As Judge Lourie wrote of the claim construction in <u>Phillips</u>:

> [E]ven though claim construction is a question of law, reviewable by this court without formal deference, I do believe that we ought to lean toward affirmance of a claim construction in the absence of a strong conviction of error. I do not have such a conviction in this case, after considering the district court's opinion and the patent specification.

<u>Phillips</u>, 415 F3d at 1330 (Lourie, J, concurring in part and dissenting in part).

I, therefore, respectfully dissent.